**Kevin JOHNSON, Plaintiff,**

**v.**

**David GARRAGHTY, et al., Defendants.**

**Civil Action No. 98–428–AM.**

United States District Court, E.D. Virginia, Alexandria Division.

July 28, 1999.

Mr. Kevin Johnson, Pound, VA, for plaintiff.

David E. Boelzner, Wright, Robinson, Osthimer & Tatum, Richmond, VA, for defendants Katie Hamlin, R.N., and Marjorie Inman, R.N.

Christopher G. Hill, Assistant Attorney General, Office of the Attorney General, Richmond, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This *pro se* 42 U.S.C. § 1983 action presents an issue of first impression in this circuit, namely whether inmates asserting excessive force claims are required, pursuant to 42 U.S.C. § 1997e(a), to exhaust their administrative remedies. For the

reasons that follow, § 1997e(a)'s broad exhaustion requirement extends to inmates asserting excessive force claims.

## I.

Plaintiff, a Virginia inmate, brings this § 1983 action against multiple defendants. Named as defendants are: David Garraghty, Greensville Correctional Center (GCC) Chief Warden; Garette P. Williams, GCC Associate Warden; Gregory L. Holloway, GCC Segregation Unit Manager; Lieutenant Marvin A. Lee, GCC Prison Guard; Lieutenant D.E. Vick, GCC Prison Guard; Lieutenant Roy Harrison, GCC Corrections Officer; Sergeant S.C. Williams, GCC Prison Guard; Sergeant R. Williams, GCC Prison Guard; Lieutenant George Turner, GCC Prison Guard; Sergeant Cox, GCC Prison Guard; Sergeant Byrd, GCC Prison Guard; G. Edlow, Licensed Practical Nurse; John Does 1 through 18, GCC Prison Guards; Jane Does 1 through 3, Licensed Practical Nurses; and Ron Angelone, Director of the Virginia Department of Corrections (VDOC).[1]

Plaintiff alleges defendants violated his constitutional rights when they (i) used excessive force against him; (ii) deprived him of his basic human needs; (iii) failed to prevent known danger to him; and (iv) denied him adequate medical care. He has also presented several state constitutional statutory and common law claims invoking federal supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Plaintiff seeks declaratory relief, together with compensatory, punitive, and nominal damages, including pre- and post-judgment interest.[2]

## II.

At all times relevant to this action, plaintiff was incarcerated at the Greensville Correctional Center. Plaintiff asserts that on December 11, 1997, defendant Lee, under the supervision of defendant Holloway, opened the food hatch to plaintiff's cell door and observed him in full restraints.[3] Plaintiff states that he complied with Lee's instruction to move to the back of his cell and sit on the bed. According to plaintiff, Lee and Holloway were accompanied by a group of guards, identified as defendants Lieutenant A. Jones, Sergeant. I. Peck, Major H. Johnson, Officer G. Scott, Sergeant J. Koch, K–9 Officer Garnes, and Officer R. Harris,[4] and defendants John Doe 8 through 18. These guards were all attired in full riot armor and black ski masks and equipped with a fifty thousand volt electric immobilizer attack shield.[5] Plaintiff claims two guard or attack dogs were also part of this force. At this point, plaintiff alleges his cell door was opened and, without warning, the entire group of guards rushed into his cell with the electric shield in front of them and slammed plaintiff's back and head into the wall. Plaintiff also contends that the guards shocked his face with the electric shield, sending painful and visible electrical currents through his face and eyes.

Plaintiff further alleges that between December 11, 1997 and December 13, 1997, guards restrained him to the bare

1. Plaintiff voluntarily dismissed defendant Mark Earley, Attorney General of Virginia, from this action. *Johnson v. Garraghty, et al.,* No. 98–428–AM (E.D.Va. Oct.6, 1998).

2. Plaintiff voluntarily dismissed all claims for injunctive relief. *Johnson v. Garraghty, et al.,* No. 98–428–AM (E.D.Va. Oct.6, 1998).

3. Plaintiff avers that he was handcuffed, secured to a heavy link waist chain by a "black box" device, and in leg shackles.

4. These defendants were substituted for defendants John Doe 1 through 7 by Order dated February 12, 1999. *See Johnson v. Garraghty, et al.,* No. 98–428–AM (E.D.Va. Feb.12, 1999). Although seven John Doe defendants have been identified, the identities of John Doe defendants 8 through 18 remain unknown.

5. Plaintiff avers that although the members of the riot team wore ski masks to conceal their identities, he was able to identify several of the masked guards.

steel bunk in his cell under an open window and that throughout this period, he was dressed only in his underwear. He also asserts that his cell was inadequately heated and that outside cold air, ranging in temperature from approximately twenty to forty degrees Fahrenheit, blew directly onto him from the open window. He contends that he repeatedly complained of the cold and asked defendants Lee, S.C. Williams, R. Williams, Byrd, Turner and other security supervisors to close the window, but that they refused to do so.

Plaintiff further asserts that between December 11, 1997 and December 13, 1997, he repeatedly informed GCC nurses of his suffering due to the cold air, including specifically muscle cramps, body chills, and severe generalized pain. Notwithstanding his complaints, plaintiff contends that defendants R. Massey, R.N., Katie Hamlin, R.N., and Marjorie Inman, R.N.[6] refused to provide him with bedding or any other heat source. He further asserts that these nurses refused to have his window closed, ignored his complaints, and refused to provide him with medical care for the injuries he sustained in the riot team attack.

Plaintiff alleges that on December 11, 1997, defendant Holloway was overheard saying that plaintiff would be "broken" because he had called Holloway derogatory epithets. Plaintiff states that on the following day Lieutenant A. Watts, who is not named as a defendant, consulted with a nurse and then ordered a blanket placed between plaintiff's back and the steel bunk to ameliorate the effects of the cold temperatures in the cell. On that same afternoon, plaintiff claims that defendant Vick, with defendant Lee's authorization, removed the blanket from plaintiff's cell. Plaintiff contends that on that same day he was given a shower, but was given inadequate time to dry himself. He states further that, over his objections, he was again restrained to his cold steel bunk beneath the open window while clad only in his underwear.

Plaintiff further alleges that on December 13, 1997, while he was restrained to his bunk, defendant Turner punched him in the jaw without justification while defendant Williams stood by and did nothing.[7]

Plaintiff asserts that as a result of these acts, he has suffered severe pain, sleeplessness, a bad flu, facial swelling and burns, a large head bruise, cuts and bruises on his wrists that required medical treatment, internal bleeding, lower back and neck pain, and extreme emotional anguish and distress.

## III.

A brief summary of this action's procedural history is warranted. On March 27, 1998, plaintiff filed this action and two months later, he filed an affidavit concerning exhaustion, in which he asserted that defendants had frustrated his efforts to exhaust his remedies in the prison grievance system with respect to the incidents giving rise to this action. On October 14, 1998, defendants filed a Motion for Summary Judgment, in which they argued: (1) that plaintiff failed to exhaust his administrative remedies as required by § 1997e(a); (2) that no issue of material fact existed to indicate the use of excessive force occurred in this case; (3) that there was no denial of adequate medical care by

---

6. These defendants were substituted for defendants Jane Doe 1 and 2 by Order dated February 12, 1999. *See Johnson v. Garraghty, et al.*, No. 98–428–AM (E.D.Va. Feb.12, 1999). In addition, defendant Jane Doe 3 has since been identified as Nurse R. Massey.

7. Plaintiff further avers that defendants Angelone, Garrette, Williams, and Garraghty promote guards who abuse inmates. Plaintiff claims that defendant Harrison admitted that Garraghty is fully aware of Harrison's and other guard's brutal abusive treatment of prisoners, including beatings. Indeed, according to plaintiff, Harrison also admitted that Garraghty, who made Harrison the Supervisor of the GCC riot team, permits and encourages such brutality as long as Harrison "cleans up" after himself.

defendants; (4) that any claim of denial of access to the courts should be dismissed; and (5) that defendants are entitled to qualified immunity from the claims brought against them in their individual capacities. On November 12, 1998, defendants filed a Motion for Protective Order, in which they asked that discovery be stayed until the issue of exhaustion of administrative remedies was resolved. By Order dated November 24, 1998, that motion was granted, except insofar as plaintiff's discovery requests sought the production of his grievance record. *Johnson v. Garraghty, et al.*, No. 98–428–AM (E.D.Va. Nov.24, 1998). Thereafter, the Court ruled that even assuming, *arguendo*, the application of § 1997e(a), plaintiff would be deemed to have complied with the exhaustion requirement because plaintiff's contention that defendants prevented him from utilizing the prison grievance system was unrefuted. *See Johnson v. Garraghty, et al.*, No. 98–428–AM (E.D.Va. Feb, 12. 1999).[8] This ruling made it unnecessary to reach or decide the question whether the exhaustion requirement of § 1997e(a) applied to inmates raising excessive force claims.

In response to this decision, defendants filed a Motion for Leave to File Supplemental Affidavits on the ground that they had never received, and hence had never had an opportunity to respond to, plaintiff's affidavit setting forth his allegations that defendants had frustrated his various attempts to exhaust administrative remedies. Defendants' motion was granted and they were given twenty days to file a supplemental affidavit concerning exhaustion. *See Johnson v. Garraghty et al.*, No. 98–428–AM (E.D.Va. March 1, 1999).

Defendants' timely Response and supporting affidavit by defendant Garraghty sharply contests plaintiff's allegation that he was prevented from exhausting his administrative grievances and requests reconsideration of the exhaustion issue. Because this issue is now factually disputed, it is now necessary to reach the question whether Eighth Amendment excessive force claims are subject to the exhaustion requirement imposed by § 1997e(a).

## IV.

Neither the Supreme Court nor any circuit court has addressed this issue, and the district courts that have remain divided, some holding that § 1997e(a)'s exhaustion requirement does not apply to § 1983 actions based on Eighth Amendment excessive force claims,[9] with others holding to the contrary.[10]

Because the question presented is one of statutory construction, analysis properly begins with the plain meaning of the statutory language. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *United States v. Barial*, 841 F.Supp. 171, 172–173 (E.D.Va.1993), *rev'd on other grounds*, 31 F.3d 216 (4th Cir. 1994). If that plain meaning is unambiguous, the interpretive task is at an end as

---

**8.** *See Langford v. Couch*, 50 F.Supp.2d 544, 550–51 (E.D.Va.1999) (holding that, absent any allegations or evidence that plaintiff was prevented from complying with prison grievance procedures, he could not avoid or evade § 1997e(a)'s exhaustion requirement) (citing *Johnson v. Garraghty, et al.*, No. 98–428–AM (E.D.Va. Feb. 12, 1999) (unpublished)).

**9.** *See Wright v. Dee*, 54 F.Supp.2d 199, 203–04 (S.D.N.Y.1999); *Carter v. Kiernan*, 1999 WL 14014, at *5 (S.D.N.Y. Jan.14, 1999); *Baskerville v. Goord*, 1998 WL 778396, at *3 (S.D.N.Y. Nov.5, 1998); *White v. Fauver*, 19

F.Supp.2d 305, 313–15 (D.N.J.1998); *Johnson v. O'Malley*, 1998 WL 292421, at *3 (N.D.Ill. May 19, 1998); *Rodriguez v. Berbary*, 992 F.Supp. 592, 592–93 (W.D.N.Y.1998).

**10.** *See George v. C.O. Lorenzo*, 1999 WL 397473, at *2 (S.D.N.Y. June 15, 1999); *Beeson v. Fishkill Correctional Facility*, 28 F.Supp.2d 884, 888–92 (S.D.N.Y.1998); *Moore v. Smith*, 18 F.Supp.2d 1360, 1363 (N.D.Ga.1998); *Morgan v. Arizona Dep't of Corrections*, 976 F.Supp. 892, 895–96 (D.Ariz. 1997).

the statute must then be applied in accordance with its plain meaning. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Patten v. United States,* 116 F.3d 1029, 1035 (4th Cir.1997). If, however, the operative statutory language is ambiguous, the remaining statutory language and the purpose of the statute must be examined for clues concerning Congress' intent concerning the disputed statutory language. *See United States v. Jackson,* 759 F.2d 342, 344 (4th Cir.1985).

■ Given these principles, analysis properly begins with an examination of § 1997e(a), which, as amended by the Prison Litigation Reform Act of 1996 (PLRA), states that:

> [n]o action shall be brought *with respect to prison conditions* under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis added).[11] Thus, the question presented is whether the key phrase, "prison conditions," includes excessive force claims. The plain meaning of this phrase clearly encompasses such claims. This follows from the plain meaning of the term "conditions," which is defined as "restricting, limiting, or modifying circumstances."[12] The force applied to an inmate is one of the attendant circumstances or "conditions" modifying his confinement. Other attendant circumstances or "conditions" of an inmate's confinement include the medical care an inmate receives, the temperature in an inmate's cell, and the ambient air quality. Although it seems clear that the plain language of § 1997e(a) applies to excessive force claims, the analysis cannot end here because some courts argue that the language may be read to include claims concerning heat, food, and medical treatment and the like, but not to extend to allegations of excessive force.[13] This argument suggests an ambiguity in the meaning of § 1997e(a).

■ To resolve this putative ambiguity, other clues as to the Congressional intent underlying § 1997e(a) must be examined. A particularly telling clue to the meaning of a statutory term or phrase is the way in which the term or phrase is used elsewhere in the statute, for it is a "well-established canon of statutory construction that words have the same meaning throughout a given statute." *Beeson,* 28 F.Supp.2d at 888. In this regard, although the phrase "prison conditions" is nowhere defined in § 1997e, it is defined in § 3636(g)(2), which was also enacted as part of the PLRA. That section prescribes remedies for prison conditions and, in so doing, defines the phrase "civil action with respect to prison conditions" as follows:

> any civil proceeding arising under Federal law with respect to the conditions of confinement *or the effects of actions by government officials on the lives of persons confined in prison,* but it does not include habeas corpus proceedings chal-

---

**11.** Prior to PLRA's amendments, § 1997e(a)(1) provided that:

> ... in any action brought pursuant to [42 U.S.C. § 1983] by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such a case for a period of not to exceed 180 days in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available.

42 U.S.C. § 1997e(a)(1) (1994) (amended 1996).

**12.** THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 306 (Unabridged ed.1981).

**13.** *See e.g. Carter,* 1999 WL 14014, at *3 (finding a "common sense interpretation" of the phrase "prison conditions" to refer to "medical treatment, food, clothing, and the nature and circumstances of the housing available in prison," but not to the use of excessive force by prison officials).

lenging the fact or duration of confinement in prison.

18 U.S.C. § 3636(g)(2) (emphasis added).

Because "prison conditions" must be given the same meaning throughout the PLRA, it follows that Congress is appropriately assumed to have intended the definition of "civil action with respect to prison conditions" used in § 3636(g)(2) to apply equally to the phrase "action ... with respect to prison conditions" in § 1997e(a). A number of courts have reasoned precisely in this fashion, concluding that civil actions by inmates raising excessive force claims satisfy § 3636(g)(2)'s definition of "civil action[s] with respect to prison conditions" because excessive force claims encompass the effects of actions by government officials on an inmate's life.[14] The rationale for this conclusion is that excessive force claims implicate the routine, orderly administration of prisons, and, as such, arise from the effects of actions by government officials on the lives of prisoners, as contemplated by § 3626(g)(2). In sum, it follows that excessive force claims fall within the scope of "prison conditions" under § 1997e(a), with the result that § 1997e(a)'s exhaustion requirement must apply to such claims.

This conclusion finds support in the PLRA's overall purpose, which, as expressed by Senator Kyl, is to deter and reduce the numbers of "frivolous inmate lawsuits ... clogging the courts and draining precious judicial resources." 141 Cong.Rec. S7498-01, S7526 (1995). A broad, mandatory exhaustion requirement that includes excessive force claims effectuates this purpose because many civil actions, including excessive force claims, are frivolous and burdensome on the judicial system.[15]

This conclusion is particularly sensible because excessive force claims typically come packaged, as here, with other, related claims indisputably subject to § 1997e(a). In the case at bar, plaintiff raises several claims in addition to his excessive force claims, including denial of adequate medical care, assault, deprivation of basic human needs, and failure to prevent known danger to plaintiff. In these circumstances, all of these related claims should be examined together and resolved administratively before a claimant should be allowed to pursue a judicial remedy. Moreover, in furtherance of the PLRA's purposes, it is important that prison administrators be accorded the first opportunity to remedy such problems. Nor does the fact that plaintiff seeks only monetary

---

**14.** *See Moore,* 18 F.Supp.2d at 1363 (finding definition of prison conditions in § 3636(g)(2) to be "the best indication of what Congress intended when it used the term ... prison conditions' in § 1997e(a)" and holding that action alleging prison guard assault on inmate encompassed the effects of actions by government officials on inmate's life); *Jones v. Detella,* 12 F.Supp.2d 824, 826 (N.D.Ill. 1998) (applying definition of "prison conditions" in § 3626 to § 1997e(a) in suit alleging assault by guard on inmate and denial of medical care); *Hollimon v. DeTella,* 6 F.Supp.2d 968, 969 (N.D.Ill.1998) (same in suit alleging unlawful strip search); *Warburton v. Underwood,* 2 F.Supp.2d 306, 311, n. 2 (W.D.N.Y.1998) (same in suit alleging denial of access to the courts); *Lacey v. C.S.P. Solano Medical Staff, et al.,* 990 F.Supp. 1199, 1204 (E.D.Ca.1997) (same in suit alleging denial of adequate medical care); *Evans v. Allen,* 981 F.Supp. 1102, 1105 (N.D.Ill.1997)

(same in suit alleging unconstitutional punishment and retaliation by prison guards); *Morgan,* 976 F.Supp. at 859–96 (same in suit alleging failure to protect inmate from assaults by other inmates and holding that this constituted an effect of actions by government officials on an inmate's life).

**15.** Significantly, both proponents and opponents of the PLRA discussed § 1983 claims broadly and failed to exclude excessive force claims from the general category of conditions of confinement claims. *See Beeson,* 28 F.Supp.2d at 891. *But cf. White,* 19 F.Supp.2d at 314 (holding that Congress intended to limit frivolous cases concerning issues such as whether an inmate was served chunky rather than creamy peanut butter, "but did not intend to reach a claim involving the systematic use of excessive physical force").

damages save him from § 1997e(a)'s exhaustion requirement.[16]

As noted earlier, a number of courts have reached the result reached here on essentially the same grounds.[17] The existing contrary authority, when closely examined, is unpersuasive. Courts in this category rely on an amendment to § 1997e(a) made by the PLRA, whereby the exhaustion requirement was changed from a discretionary requirement applicable to all § 1983 inmate actions to a mandatory requirement applicable to all inmate actions "with respect to prison conditions." Those courts conclude that Congress intended to limit § 1997e(a)'s exhaustion requirement to "a subset of all possible actions," not including excessive force claims. *Baskerville*, 1998 WL 778396, at \*3. *See also White*, 19 F.Supp.2d at 314. Yet, while actions with respect to prison conditions are a subset of all possible actions, "it does not follow that this subset excludes claims of excessive force." *Beeson*, 28 F.Supp.2d at 889 (opining that Congress may have intended to exclude other categories of prisoner litigation, such as § 1983 claims that arose before an inmate's confinement or actions unrelated to inmates' imprisonment, from § 1997e(a)'s coverage). As such, reliance on this amendment for the proposition that § 1997e(a) is inapplicable to excessive force claims is unpersuasive.

Other authority relied upon by courts that exempt excessive force claims from § 1997e(a)'s mandate includes two Supreme Court decisions, *Hudson v. McMillian*,[18] and *Farmer v. Brennan*,[19] that distinguish between conditions of confinement and excessive force claims.[20] Reliance on these decisions in interpreting § 1997e(a) is inappropriate for two reasons. First, courts must look at Congress' intent in referring to "prison conditions" when it passed the PLRA, not the intent of the Supreme Court when it used a similar term in cases decided before the PLRA was enacted. *See Beeson*, 28 F.Supp.2d at 890. Second, the premise of this argument, namely that the Supreme Court distinguished between conditions of confinement claims and excessive force claims, is significantly undermined by the fact that the Supreme Court, in another pre-PLRA case, has also interpreted the term "conditions of confinement" to include excessive force claims. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (interpreting "petitions challenging conditions of confinement" in statute involving referral of cases to magistrate judges to include isolated episodes of unconstitutional conduct by prison officials, including assault).

In summary, actions raising excessive force claims are actions with respect to "prison conditions" within the meaning of § 1997e(a) and, as such, must be administratively exhausted. To conclude otherwise would run contrary to § 1997e(a)'s plain language and purpose.

## V.

■ Because excessive force claims fall within § 1997e(a), it is necessary to ad-

---

16. *See Langford v. Couch*, 50 F.Supp.2d 544, 546 (E.D.Va.1999) (§ 1983 claim) (§ 1997e(a) requires inmates seeking solely monetary damages to exhaust all administrative remedies notwithstanding that such remedies do not include money damages); *Sallee v. Joyner*, 40 F.Supp.2d 766, 767 (E.D.Va.1999) (same in *Bivens* action).

17. *See supra* note 8.

18. In *Hudson v. McMillian*, the Supreme Court recognized a different standard for analyzing Eighth Amendment violations resulting from poor prison conditions as opposed to the use of excessive force. 503 U.S. 1, 8–9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

19. In *Farmer v. Brennan*, the Supreme Court distinguished between the obligations imposed on prison officials by the Eighth Amendment to abstain from excessive force and to maintain humane conditions of confinement. 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

20. *See Carter*, 1999 WL 14014, at \*4–5; *Baskerville*, 1998 WL 778396, at \*3–4; *White*, 19 F.Supp.2d at 314–15; *Rodriguez*, 992 F.Supp. at 593.

dress the question whether this plaintiff complied with that requirement in this instance. This question is sharply disputed. Plaintiff contends that defendants prevented him from utilizing the prison grievance system, and that as a result, administrative remedies were not available to him.[21] Defendants flatly deny this contention, claiming that no defendant or GCC staff member interfered in any way with plaintiff's ability to prosecute his administrative grievances.[22] In fact, Garraghty has submitted a copy of a March 17, 1998 memorandum to Briggs in which Garraghty stated that, after investigation, he determined plaintiff's allegation that the prison grievance system was unavailable to him to be baseless.

This issue merits an evidentiary hearing. Accordingly, this matter will be referred to a Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1), to determine whether plaintiff exhausted all available administrative remedies and, if not, whether defendants prevented him from doing so such that the exhaustion requirement should be deemed satisfied.

## VI.

■■■■ Defendants argue, in their Motion for Summary Judgment, that they are entitled to the defense of qualified immunity for the claims brought against them in their individual capacities. Qualified immunity shields government officials performing discretionary functions from civil liability insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether a prison guard is shielded from liability for his conduct under this doctrine depends upon whether a reasonable prison guard possessing the same information could have believed his conduct to be lawful. *Rainey v. Conerly,* 973 F.2d 321, 323 (4th Cir.1992). It is important for issues of qualified immunity to be resolved as soon as possible so as to save deserving defendants from the costs and burdens of defense. *See Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (immunity questions should be resolved "at the earliest possible stage in litigation"); *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (qualified immunity questions "should be resolved at the earliest possible stage of a litigation").

It is unclear on the basis of the current record whether any defendants are entitled to qualified immunity. A hearing would likely clarify the matter. It may be that resolution of the qualified immunity defense here depends on a resolution of disputed fact issues or on a credibility determination.[23] On the other hand, a more developed record might render such a determination unnecessary. Thus, this issue will be referred to a Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1), for an evidentiary hearing and recommendation as to defendants' claim of qualified immunity.

21. Specifically, plaintiff avers that defendant Holloway and prison ombudsmen interfered with his ability to comply with prison grievance procedures. Plaintiff submitted two letters in support of his contentions. The first is a letter he wrote to James E. Briggs, Manager of the VDOC Ombudsman Services Unit, wherein plaintiff informed Briggs that GCC employees were interfering with his access to grievance procedures. In the second letter, Briggs informed Garraghty that plaintiff's letter was being forwarded to Garraghty for a response. Plaintiff avers that Garraghty has not responded to his complaints.

22. Garraghty concludes that plaintiff never initiated a grievance concerning the alleged facts giving rise to this action.

23. The Fourth Circuit has held that where plaintiff and defendants' version of the underlying facts are in direct contradiction, resolution of the qualified immunity issue is inappropriate at the summary judgment stage. *Id.* at 324. *See also Vathekan v. Prince George's County,* 154 F.3d 173 (4th Cir.1998) (summary judgment on qualified immunity grounds "improper as long as there remains any material factual dispute regarding the actual conduct of the defendants") (citation omitted).

## VII.

As explained earlier, in response to plaintiff's discovery requests, defendants obtained a protective order against all discovery in this action, except insofar as plaintiff requested the production of his grievance record, until the threshold issue of exhaustion of administrative remedies is resolved. *See Johnson v. Garraghty, et al.,* No. 98–428–AM (E.D.Va. Nov.24, 1998). Before pending discovery disputes can be reached, two threshold questions, namely whether plaintiff complied with § 1997e(a)'s exhaustion requirement and whether defendants are entitled to the defense of qualified immunity, must be resolved. *See Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (threshold issues, such as the defense of qualified immunity, must be resolved prior to the commencement of discovery). Quite apart from this, the Magistrate Judge has discretion to lift the protective order, in whole or in part, if doing so would aid in the resolution of the referred questions. Also, when the referred questions are resolved, any remaining discovery disputes may be considered and resolved by the Magistrate Judge, if appropriate.

An appropriate Order will issue.